Filed 3/18/15  P. v. Esquivel CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>RICARDO ANTONIO ESQUIVEL,<br><br>　　　Defendant and Appellant. | H038539<br>(Santa Clara County<br>　Super. Ct. No. CC459157) |
| In re RICARDO ANTONIO ESQUIVEL,<br><br>　　　on Habeas Corpus. | H040704 |

A jury convicted defendant Ricardo Antonio Esquivel of second degree murder of Raul Curiel and of assaulting fellow inmate Shiloh Brummitt with a deadly weapon.  On appeal, Esquivel asserts claims of evidentiary error, instructional error, ineffective assistance of counsel, and prosecutorial misconduct.  He further challenges certain of the fines and fees the trial court imposed at sentencing.  In a petition for a writ of habeas corpus, which we have ordered considered together with the appeal, Esquivel raises claims of ineffective assistance of counsel.  We modify the judgment with respect to the restitution fine, parole revocation restitution fine, criminal conviction assessments, and court security fees imposed.  We affirm the judgment as modified and deny the petition for writ of habeas corpus.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

*A. Defendant is Charged*

On September 30, 2010, the Santa Clara County District Attorney filed a two-count information against Esquivel. Count 1 charged Esquivel with the November 30, 2003 murder of Raul Curiel (Pen. Code, § 187)[1] and alleged Esquivel had personally used a deadly weapon in the commission of that offense (§ 12022, subd. (b)(1)). Count 2 charged Esquivel with assaulting Shiloh Brummitt with a deadly weapon in March 2010 (§ 245, subd. (a)(1)) and alleged Esquivel had personally used a dangerous and deadly weapon in the commission of that offense (§§ 667, 1192.7).

*B. Evidence Adduced Regarding the Killing of Raul Curiel*

Esquivel went to trial on both counts in March 2012. The jury heard approximately seven and a half days of testimony.

It was undisputed at trial that Esquivel stabbed Curiel to death during a brief altercation in a crowded night club in 2003. It was further undisputed that Esquivel fled the club and was not arrested until approximately five years later. At issue with respect to Curiel's death was Esquivel's mental state, including whether he acted in imperfect self-defense or in the heat of passion. The following evidence was adduced regarding Curiel's death.

*1. Jeanne Fuentes*

Curiel's wife, Jeanne Fuentes, testified that on the evening of November 29, 2003, she, Curiel, and her cousin, Maricela Castro, went to the night club, Zoe's. On their way out of the club, the three passed through a hallway where the restrooms were located. Fuentes walked behind Curiel, holding his hand. Fuentes testified that she stopped when someone grabbed her buttock and breast. She turned around and verbally confronted the man behind her, who she identified at trial as Esquivel. Fuentes had never seen Esquivel

---

[1] Further unspecified statutory references are to the Penal Code.

before.  Fuentes told Curiel the man had grabbed her.  Curiel began yelling at Esquivel but, according to Fuentes, did not throw a punch.  Fuentes testified that a second individual attempted to pull Curiel's shirt over his head from behind and Esquivel struck Curiel from the front several times.  She did not see a weapon but soon realized her husband had been stabbed.  Fuentes testified that she might have told police Curiel threw a punch, but "that's not what I meant.  I meant when his hand was going to try to pull his shirt down, it looked like he was going to try to throw a punch."  Curiel collapsed outside the club in a pool of blood.  An ambulance took him to the hospital.  Fuentes was unable to accompany Curiel because officers took her to the police department to be interviewed.

On cross-examination, Fuentes contradicted or was unable to remember many of the things she told officers during that initial interview, which took place in the early hours of November 30, 2003.  Fuentes sought to explain the inconsistencies by saying she "would have said anything" to the officers because she "just wanted to be at the hospital" with Curiel.  Defense counsel also impeached Fuentes with her statements to police during a December 2, 2003 interview.  For example, she told police she saw bouncers throw both men involved in the fight with Curiel out of the club, but she testified that she saw only one man get thrown out.  In the December 2 interview, Fuentes stated that during the altercation "my husband threw the thing . . ." and "[a]s soon as my husband heard [Esquivel call me a] 'bitch,' there went the swing, but I don't believe Raul was able to contact."  At trial, Fuentes testified that neither statement meant Curiel threw a punch, saying instead that he tried to pull down his shirt and may have made a punching motion after being stabbed.  Defense counsel also highlighted inconsistencies between Fuentes's trial testimony and her testimony at a September 20, 2010 hearing.

On redirect, the prosecutor sought to rehabilitate Fuentes's credibility by playing an audio recording of Fuentes learning Curiel had died, which was recorded shortly after 5:00 a.m. on November 30, 2003.  Defendant objected to the admission of the audio recording as irrelevant and unduly prejudicial.  At a sidebar conference, the prosecutor

3

argued the recording was probative of Fuentes's state of mind at the time she made her initial statements to police and substantiated her claim that "she would have told the police whatever they wanted to hear because she wanted to get out of there [because she] didn't know her husband was dead." The court admitted the recording, reasoning that "it has a lot of probative value because" it "makes it very clear what she was feeling emotionally, as she was going through this interview," including her desire not to do further interviews. The court acknowledged the audio was "emotional," but noted that so too was Fuentes's in court testimony, such that "the emotional impact of the testimony versus what is on the audio, it doesn't seem to be, in the Court's view, all that different."

In the audio recording, the police chaplain informs Fuentes "your husband is dead." She responds, "No, no, no, please, no. [¶] . . . [¶] Oh, my God (crying). No, it can't be. No (crying). [¶] . . . [¶] I don't talk no more to nobody. Do I have to? I don't want to. Please don't make me. (crying) [¶] . . . [¶] Why--why did he kill my husband? Why did he do that?"

### 2. *Maricela Castro*

Fuentes's cousin, Maricela Castro, testified that she was behind Curiel and Fuentes as they exited the club. The hallway near the restrooms was crowded and she became separated from them. Castro heard Fuentes angrily yelling "Why did you grab me? Why did you touch me?" Castro acknowledged that, on the night of the stabbing, she told police she saw Curiel try to punch someone. At trial, she said she saw a hand go up but was unsure whether Curiel threw a punch.

### 3. *Justin Bell*

Justin Bell testified that he was working as a bouncer at Zoe's on the night Curiel was stabbed. The club was very crowded that night. He was in the hallway where the restrooms were located when he heard a loud gasping and the area cleared out. He saw Curiel clutching his stomach. Bell looked toward the front of the club; everyone was looking in his direction except for one man, who was moving toward the front entrance.

4

Bell grabbed the man from behind in a bear hug; the man did not resist. Bell turned the man over to another security guard, Gurvinder Atwal.

### 4. *Gurvinder Atwal*

Gurvinder Atwal, another Zoe's bouncer, testified that on the night of the stabbing he threw a patron out of the club. Once he released the man outside, the man ran away. On the night of the incident, Atwal told police another patron handed him a knife.

### 5. *Sean Kelly, M.D.*

Medical examiner Sean Kelly, M.D., performed an autopsy on Curiel. Dr. Kelly testified that Curiel was stabbed four times in the torso and once in the right arm. Curiel had bruises on his face that Dr. Kelly opined were consistent with multiple blunt force impacts. Curiel had cuts caused by a sharp object and a scrape on his right hand.

### 6. *James Randol*

James Randol, the lieutenant in charge of the San Jose Police Department's homicide unit, testified that he arrested Esquivel on November 25, 2008. The court admitted into evidence an arrest warrant for Esquivel dated January 14, 2004.

### 7. *Kapur Ghimire*

Kapur Ghimire testified for the defense that he was at Zoe's on the night of the stabbing. Ghimire was in the hallway near the bathrooms, which he testified was very crowded. He saw an older couple and a young man get into an argument and saw the younger man punch the older man, Curiel, in the stomach. At trial, Ghimire did not recall whether he saw Curiel punch the younger man. However, on the night of the incident, he told police Curiel threw a punch at the younger man. Ghimire did not see a second individual pull Curiel's shirt over his head. Ghimire testified that the younger man ran towards the front of the club after hitting Curiel.

### 8. *Sonia Pereira*

Another Zoe's patron, Sonia Pereira, also testified for the defense. She testified that she was in the crowded hallway and saw two men arguing and a woman trying to

5

break up the argument. Curiel, who was facing her, threw a punch. She assumed the punch did not make contact because the other man, Esquivel, did not react. Esquivel, whose back was to Pereira, made a motion "almost immediately" and Curiel fell to the ground. Pereira testified that Esquivel took five or six swings at Curiel's abdomen. Esquivel then ran towards the front of the club, pushing past Pereira and her friends.

### 9. *Esquivel*

Esquivel testified in his own defense. He went to Zoe's with friends on the night of November 29, 2003. At that time he was 21 years old, "skinny" at 150 pounds, and a member of the West Side Mob gang. He was carrying a knife in his pants pocket, as he always did, for protection.

Esquivel drank five or six Long Island Iced Teas at Zoe's and was drunk. He saw Curiel and Fuentes in the crowded hallway on his way out of the club. His chest touched Fuentes's left side as he tried to squeeze past her. He denied grabbing her breast or buttocks. Fuentes started screaming at him. As he tried to calm her Curiel punched him in the face. According to Esquivel, Curiel continued to hit him. It was too crowded to run away and Esquivel was unable to hit back because Curiel was bigger and stronger. Afraid he was going to die, Esquivel pulled out his knife and started swinging it at Curiel. He testified that he stopped swinging when Curiel stopped punching; he then tried to run away. A bouncer picked him up, at which point he dropped the knife. When the bouncer released him outside the club, Esquivel ran. He did not go to the police because he did not think they would believe him because of his gang ties.

Esquivel testified that he was physically and sexually abused as a child. He also observed his sister being molested by his stepfather. When he told his mother about the molestation she did nothing about it.

### 10. *Rahn Minagawa*

Rahn Minagawa, Ph.D., testified as a defense expert in the areas of drug and alcohol abuse and addiction; child and adolescent development, including in the context

6

of gang culture; and childhood and adolescent trauma. Dr. Minagawa met with Esquivel on four occasions. At one of those meetings, Esquivel denied being drunk on the night of the stabbing. Based on those meetings, Esquivel's performance on tests Dr. Minagawa administered, and Esquivel's mental health records, Dr. Minagawa diagnosed Esquivel with depression, alcohol dependence in partial remission, physical abuse as a child, sexual abuse as a child, adult antisocial behavior, and adult antisocial personality traits.

Dr. Minagawa opined that various factors increased Esquivel's "subjective fear and emotional reactivity" during the altercation with Curiel and caused him to display "hypervigilance." Those factors included a history of trauma as a child, participation in a violent street gang, and alcohol intoxication. (While Esquivel told Dr. Minagawa he was not drunk when he stabbed Curiel, Dr. Minagawa opined Esquivel had been intoxicated, as Esquivel told police he had consumed a number of drinks on the night of the stabbing.) Dr. Minagawa opined that Esquivel's actions likely were impulsive and emotionally driven.

### 11. *Curiel Character Evidence*

The defense was permitted to introduce evidence of Curiel's character for violence.

Shellie Knowles testified that she met Curiel in 1998 through his then-wife, Margaret Celaya. Knowles and Celaya met Curiel at a bar. As Celaya introduced Knowles and Curiel, Curiel punched Knowles multiple times in the face and head and accused her of stealing his CDs. She required hospitalization.

A number of police officers testified about incidents of domestic violence by Curiel against Celaya in 1997 and 1998. Celaya testified that she and Curiel fought but that she had no memory of the incidents.

7

### C.   *Evidence Adduced Regarding the Assault of Shiloh Brummitt*

#### 1.   *George Mignosa*

George Mignosa, a corrections officer at the Santa Clara County Sheriff's Department, testified that he escorted Esquivel from his cell in the county jail to the showers on March 19, 2010. As the two passed inmate Shiloh Brummitt's cell, Esquivel asked Brummitt to shake his hand. The two made contact and Brummitt said, "Hey, this guy cut me." Mignosa saw Esquivel throw a weapon consisting of a toothbrush with a razor affixed to it with thread.

#### 2.   *Esquivel*

Esquivel admitted to cutting Brummitt's hand, saying he did so because Brummitt had threatened him and he wanted Brummitt to be moved to another part of the jail. Esquivel testified he drank jail house liquor before the incident. Esquivel acknowledged involvement in other confrontations while in custody and drunk, including verbally threatening officers and wrestling with an officer.

### D.   *Verdict, Sentencing, and Appeal*

On April 2, 2012, after deliberating for an afternoon and a morning, the jury rendered its verdict. It found Esquivel not guilty of first degree murder, guilty of second degree murder, and guilty of assault with a deadly weapon. Jurors also found true both weapons allegations.

A sentencing hearing was held on May 25, 2012. The court sentenced Esquivel to a term of 15 years to life on count 1, a consecutive one-year term for the personal use of a deadly weapon enhancement, and a consecutive three-year term on count 2. With respect to the restitution fine required under section 1202.4, subdivision (b), the court stated: "I would rather have the money go to restitution so I'd like to reduce that to the minimum so we get money paid to the victims. So . . . what is it, 200-plus . . . is that 240 or 250?" The court clerk responded "two forty." The court then imposed a restitution fine of $240 (§ 1202.4, subd. (b)(2)) and a parole revocation restitution fine of $240 (§ 1202.45). The

court also orally imposed a court security fee of $50 pursuant to section 1465.8 and a criminal conviction assessment of $50 pursuant to Government Code section 70373.

There are separate abstracts of judgment for each count. The abstract of judgment on count 1 sets forth a $240 restitution fine (§ 1202.4, subd. (b)), $240 parole revocation fine (§ 1202.45), a $60 court security fee (§ 1465.8), and a $60 criminal conviction assessment (Gov. Code, § 70373). The abstract of judgment on count 2 likewise sets forth a $240 restitution fine (§ 1202.4, subd. (b)), $240 parole revocation fine (§ 1202.45), a $60 court security fee (§ 1465.8), and a $60 criminal conviction assessment (Gov. Code, § 70373).

Esquivel timely appealed.

## II. DISCUSSION

### A. *Admission of the Fuentes Audio Recording*

Esquivel contends the trial court erred by admitting, over defense counsel's objection, the audio recording of Fuentes learning of Curiel's death. That evidence should have been excluded, Esquivel says, as irrelevant or under Evidence Code section 352 as more prejudicial than probative.

#### 1. *Legal Principles and Standard of Review*

Only relevant evidence is admissible. (Evid. Code, § 350.) The Evidence Code defines "relevant evidence" broadly as "evidence . . . having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210, italics added.) " '[T]he trial court has broad discretion to determine the relevance of evidence.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) "On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

9

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) For purposes of Evidence Code section 352, evidence is "prejudicial" if it " ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).) " ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.) "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*Kipp*, *supra*, at p. 1121.)

2. *Admission of the Recording Did Not Constitute Prejudicial Error*

The audio recording corroborated Fuentes's testimony on cross-examination that she would have told police anything during the first interview in order to go be with her husband, whom she believed was fighting for his life at the hospital. Accordingly, the trial court did not abuse its discretion in concluding the recording was relevant to Fuentes's state of mind when she was interviewed and to the credibility of her trial testimony, which differed at times from her interview statements.

With respect to Evidence Code section 352, both the probative value of the audio recording and the probability that its admission would create a substantial danger of undue prejudice were minimal. While the recording was probative of Fuentes's state of mind, it was cumulative of the other evidence. The rest of Fuentes's testimony made clear that she was emotional at the time of her first police interview. And the inference that Fuentes was upset during that interview was supported by evidence that, just prior to

10

the interview, Fuentes had witnessed her husband get stabbed, collapse in a pool of blood, and get whisked away to the hospital while she was forced to speak with police. Similarly, with respect to prejudice, the recording was emotionally charged, but no more so than the rest of Fuentes's testimony. Thus, we perceive no abuse of discretion in the court's conclusion that the probative value of the recording was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice.

Even assuming the trial court abused its discretion in admitting the audio recording, that error was harmless. Generally, the admission of evidence in violation of state law, here Evidence Code section 352, is reversible only upon a showing that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) A due process clause violation, requiring review under the more stringent federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18, occurs where the admission of the evidence "makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The admission of the audio recording was not " 'so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Accordingly, we apply the *Watson* harmless error standard. Because the recording merely was cumulative of Fuentes's testimony, defendant fails to show a reasonable probability that the trial court's ruling, even if error, affected the outcome of his case.

### B. CALCRIM No. 372

The trial court instructed the jury with CALCRIM No. 372, which addresses how jurors should evaluate evidence that a defendant fled the crime scene. The jury was instructed as follows: "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee

11

cannot prove guilt by itself."

While Esquivel did not object to that instruction at trial, he now argues it violated his right to due process by allowing the jury to infer he had a culpable mental state at the time of the offense. According to Esquivel, CALCRIM No. 372 should not be given where, as here, the sole question before the jury relates to the defendant's mental state. The People respond that Esquivel forfeited any challenge to CALCRIM No. 372 and that, in any event, the instruction was neither erroneous nor prejudicial.

Even assuming Esquivel did not forfeit his challenge to CALCRIM No. 372, we are bound by Supreme Court precedent to conclude it is meritless. Our high court repeatedly has rejected the argument that a flight instruction is improper when the only disputed issue is the defendant's mental state at the time of the crime. (*People v. Smithey* (1999) 20 Cal.4th 936, 983 [citing and declining to reconsider numerous decisions rejecting contention that flight instruction "should be given only when the identity of the perpetrator is disputed, and not when the principal disputed issue is the defendant's mental state at the time of the crime"].) Because Esquivel's argument is indistinguishable from the arguments advanced in *Smithey* and the cases it cites, we must reject it. (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455-456.) Accordingly, we conclude the trial court did not err by instructing the jury with CALCRIM No. 372.

### C. *The Trial Court Did Not Err by Excluding Evidence of Curiel's Gang Affiliation*

Esquivel moved in limine to introduce evidence of Curiel's gang affiliation to counter any argument by the prosecution that his five years on the run evinced a consciousness of guilt. Esquivel sought to argue that he fled, not out of an awareness of guilt, but because he feared gang retribution for Curiel's death. On appeal, Esquivel maintains the trial court erred by excluding evidence that Curiel was in a gang.

### 1.    Relevant Facts

As the jury heard at trial, Esquivel was not arrested for Curiel's murder until November 2008, nearly five years after an arrest warrant was issued for him in January 2004. Jurors did not learn that Esquivel lived in Mexico for the time between Curiel's death and his arrest.

Defense counsel first raised the issue of Curiel's alleged gang affiliation at a hearing on February 8, 2012. Defense counsel argued: "if the DA wants to bring in any evidence of flight or wants a flight instruction, then absolutely the defendant has an opportunity to explain that flight. [¶] So if the argument is he left to go to Mexico for five years, we're entitled to explain his state of mind, why did he go to Mexico for five years." Defense counsel suggested that if the court limited the flight instruction to Esquivel's flight from the club it "might not be an issue." The court deferred ruling on the admissibility of evidence of Curiel's gang membership, noting the issue had not been briefed. When the issue arose at a subsequent hearing, the court advised defense counsel "you may want to think . . . about what happens if the District Attorney decides to . . . explain the subsequent arrest five years later without going into the sojourn to Mexico."

Thereafter, on February 28, 2012, Esquivel moved in limine to introduce evidence that Curiel was affiliated with the Nuestra Familia gang to support "an alternative explanation for [Esquivel's] departure to Mexico." In particular, he sought to introduce evidence Curiel sported gang tattoos, police reports stating Curiel was a former Norteno or current Nuestra Familia member, and evidence Esquivel told police at the time he turned himself in that he had fled due to "the [Nuestra Familia] issue."

At a March 8, 2012 hearing, the issue was addressed in the context of the prosecution's intention to introduce testimony that Esquivel did not return home in the days following Curiel's death. The court stated that it was inclined to admit evidence of Curiel's gang membership if such evidence was introduced. Ultimately, no witness

13

testified to Esquivel's whereabouts in the days following the stabbing and no evidence of Curiel's gang affiliation was admitted.

During closing arguments, the prosecutor urged that Esquivel's five years on the lam were probative of his guilt, stating: "You got an instruction about flight. That's what the defendant did. . . . [¶] By fleeing, what he did is he raised his hand and he said, 'I'm guilty, everyone. I murdered an innocent man,' then he dropped that knife, and he took off for five years." Defense counsel objected. At a sidebar, defense counsel claimed the prosecutor's reference to Esquivel's five-year absence violated the court's ruling on the issue, which she said required any argument regarding flight be limited to the flight from the club. The prosecutor countered that the court's ruling merely precluded him from mentioning Mexico.[2] The trial court overruled the objection, reasoning that the prosecutor's "three-word remark" did not bring "undue attention" to Esquivel's actions or whereabouts prior to his arrest.

### 2. Esquivel Fails to Establish Prejudicial Error

The People assert Esquivel forfeited his current challenge because, below, his counsel agreed that the gang evidence was unnecessary so long as the prosecution did not introduce evidence that defendant went to Mexico. Defense counsel's position was not quite so narrow. She maintained that evidence of Curiel's gang membership should be admitted to counter *any* argument related to defendant's extended flight, not merely those mentioning Mexico. For example, she argued that if evidence of police surveillance of Esquivel's home was admitted, she should be permitted to counter with evidence of Curiel's gang membership. While the discussion below often was framed in terms of defendant's flight to Mexico, a review of the record indicates that "Mexico" merely was shorthand for defendant's flight beyond his initial departure from Zoe's.

---

[2] Neither Esquivel nor the People point us to any definitive ruling on the motion in limine.

14

That said, we agree that Esquivel forfeited the evidentiary challenge he seeks to assert. Below, he sought to introduce evidence of Curiel's gang membership *only* to the extent the prosecution introduced evidence as to his whereabouts between the stabbing and his arrest.[3] No such evidence was admitted, mooting the issue. While the jury learned that five years elapsed before defendant was arrested, his counsel neither objected to the admission of that evidence, nor tied her request to introduce evidence of Curiel's gang membership to its admission.

In our view, Esquivel's challenge might be more properly framed in terms of prosecutorial misconduct. Esquivel contends the trial court excluded evidence of Curiel's gang connections on the condition that the prosecutor advanced no argument regarding flight beyond that from the club. Assuming that is the case, then the prosecutor's closing argument violated the court's order. But even if we were to construe Esquivel's appeal as raising a prosecutorial misconduct claim, we would reject that claim on the merits. Esquivel does not point us to any ruling precluding the prosecutor from arguing that defendant's five-year flight evinced a consciousness of guilt. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 477, fn. 6 ["The burden is on the party challenging a judgment to affirmatively show error. . . ." "[A] silent record . . . compels the application of the presumption of correctness."].) Notably, defense counsel did not request that the jury be instructed to consider only evidence that the defendant fled from Zoe's, and the flight instruction was not so limited. For the foregoing reasons, we discern no error related to the issue of Curiel's gang membership.

---

[3] At one hearing, defense counsel argued that evidence of Curiel's gang affiliation should be admitted if any flight instruction was given. However, defendant did not assert that position in his motion in limine, nor did defense counsel object to the flight instruction. Therefore, we consider the argument to have been abandoned.

## D. CALCRIM No. 371

The court instructed the jury with CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." Defense counsel opposed the instruction on the ground that, as to count 1, it was unsupported by sufficient evidence because the evidence showed Esquivel accidentally dropped the knife when he was thrown out of the club. Defendant reasserts that argument on appeal.

We disagree with Esquivel's contention that there was no evidence from which the jury reasonably could have concluded that he sought to conceal the knife he used to stab Curiel and, by so doing, manifested a consciousness of guilt. The evidence showed Esquivel dropped the knife in the club. One reasonable inference from that evidence is that Esquivel discarded the knife in the hopes that it would be lost in the busy club. (*People v. Williams* (1996) 46 Cal.App.4th 1767, 1780 [instruction proper where search of defendant's residence produced some but not all of the clothing worn by defendant during the crime, reasoning "it was entirely reasonable to assume that appellant hid certain items of clothing that he wore in order to thwart efforts to establish his identification"].)

Moreover, CALCRIM No. 371 itself admonished the jury to consider the weight and significance of the evidence *only* if it first found defendant did in fact attempt to hide evidence. Thus, jurors were free to accept Esquivel's explanation that he dropped the knife accidentally and to make no consciousness of guilt inference. For these reasons, we conclude the court did not err by instructing the jury with CALCRIM No. 371.

## E. CALCRIM No. 625

The trial court instructed the jury on how to consider evidence of Esquivel's voluntary intoxication with CALCRIM No. 625. Jurors were told: "You may consider

16

evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose."

Esquivel claims the court erred by not instructing that evidence of his voluntary intoxication also could be considered in assessing whether he acted in the heat of passion or in imperfect self-defense. While Esquivel did not request such an instruction below, he maintains the trial court had a sua sponte duty to instruct jurors on voluntary intoxication as it related to those defense theories. Alternatively, he contends--in both his appeal and his petition for a writ of habeas corpus--that his trial counsel rendered constitutionally ineffective assistance by failing to request such an instruction.

### 1. Legal Principles of Criminal Homicide

"Criminal homicide is divided into two types: murder and manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).) Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. (§ 188.) "Express malice is an intent to kill. [Citation.] . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296-297.)

There are two degrees of murder. Any willful, deliberate, and premeditated killing is first degree murder. (§ 189.) First degree murder necessarily entails express malice. (*People v. Cook* (2006) 39 Cal.4th 566, 597.) Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements of willfulness, premeditation, and deliberation. (*People v. Knoller* (2007) 41 Cal.4th 139,

17

151.)  Second degree murder may involve either express malice (intentional, unpremeditated killing) or implied malice (killing resulting from an intentional dangerous act carried out with conscious disregard for life).  (*People v. Rogers* (2006) 39 Cal.4th 826, 867; CALJIC Nos. 8.30, 8.31.)

Manslaughter is the unlawful killing of a human being without malice.  (§ 192.) There are three kinds of manslaughter:  voluntary, involuntary, and vehicular.  (*Ibid*.) Only voluntary manslaughter is at issue here.  An unlawful killing constitutes voluntary manslaughter, as opposed to murder, where one of two circumstances precludes the formation of malice:  (1) the defendant kills in a sudden quarrel or heat of passion, or (2) the defendant kills in an actual but unreasonable belief in the need for self-defense. (*Ibid*.; *People v. Elmore* (2014) 59 Cal.4th 121, 133-134 (*Elmore*).)  Thus, some jurists have suggested that express malice is better characterized, not simply as intent to kill, but as such "intent combined with an absence of the factors that would reduce the killing to manslaughter" (i.e., heat of passion and imperfect self-defense).  (*People v. Wright* (2005) 35 Cal.4th 964, 981 (conc. opn. of Brown, J.); *People v. Breverman* (1998) 19 Cal.4th 142, 189 (*Breverman*) (dis. opn. of Kennard, J.).)

A person kills in a heat of passion where (1) the victim's conduct is "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" and (2) they actually kill under a heat of passion caused by the victim's conduct.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584 (*Manriquez*).)  "Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component.' "  (*Id*. at p. 584.)

Imperfect or unreasonable self-defense involves a "subjectively" real but "objectively unreasonable" belief in the need to defend.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  It applies where "[a] defendant who makes a factual mistake misperceives the objective circumstances," but not where "[a] delusional defendant holds a belief that is divorced from the circumstances."  (*Elmore*, *supra*, 59 Cal.4th at p. 137.)

18

## 2. *The Use of Voluntary Intoxication Evidence*

"Prior to 1981, voluntary intoxication was relevant generally to the defense of diminished capacity." (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1297 (*Timms*).) In 1981, the Legislature abolished the diminished capacity defense, such that evidence of voluntary intoxication no longer was admissible "to negate the *capacity* to form any mental states for the crimes charged." (*Ibid.*, italics added.) Such evidence remained admissible "to show whether the defendant *actually* had the required mental state for the crime charged." (*Ibid.*, italics added.) In 1995, the Legislature amended section 22 of the Penal Code (current section 29.4) to preclude the admission of voluntary intoxication evidence to negate implied malice. (*Timms*, *supra*, at p. 1298; § 29.4, subd. (b) [limiting the admissibility of voluntary intoxication evidence to "the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought"].) Thus, evidence that a defendant was voluntarily intoxicated at the time he or she killed may be admitted to show he or she did not form an intent to kill the victim (to negate express malice) but not to show he or she did not harbor a " 'conscious disregard' " for life (to negate implied malice). (*Timms*, *supra*, at pp. 1298, 1300.)

As noted, second degree murder can be committed with express or implied malice. Under section 29.4, a defendant's voluntary intoxication precludes his or her conviction of second degree murder on an express malice theory. By contrast, "app[arently,] [a] defendant's voluntary intoxication . . . would not prevent his conviction of second degree murder on an implied malice theory." (*People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40; *Timms*, *supra*, 151 Cal.App.4th at p. 1302 ["a voluntarily intoxicated offender charged with first degree murder can be convicted of second degree murder on a theory of implied malice, for which evidence of voluntary intoxication could not be considered"].)

19

### 3. *Contentions on Appeal*

Esquivel complains jurors should have been permitted to consider evidence of his voluntary intoxication in determining whether he was subjectively provoked (for purposes of his heat of passion theory) and whether he actually believed he was in imminent danger and needed to use deadly force (for purposes of his imperfect self-defense theory). The prosecutor argued for a second degree murder conviction based on both express and implied malice theories. In his opening brief, Esquivel makes no distinction between the two theories, suggesting the analysis begins and ends with the fact that his drunkenness is relevant to his state of mind.

The People respond that CALCRIM No. 625 accurately explained that voluntary intoxication may negate express malice and that section 29.4 precludes the use of voluntary intoxication to negate implied malice.

Esquivel's response is two-fold. First, he disagrees with the People's contention that CALCRIM No. 625 properly informed jurors they could consider evidence of his voluntary intoxication in deciding whether he killed with express malice. Specifically, he contends the instruction improperly used the phrase "intent to kill" as opposed to "express malice." Second, he urges voluntary intoxication evidence is admissible to establish heat of passion or imperfect self-defense even where the prosecution seeks a second degree murder conviction on an implied malice theory.

### 4. *Esquivel Fails to Establish Prejudice*

We begin with Esquivel's position regarding express malice. As noted, it has been suggested that express malice is intent to kill *plus* the absence of heat of passion and imperfect self-defense. (*People v. Wright*, *supra*, 35 Cal.4th at p. 981 (conc. opn. of Brown, J.); *Breverman*, *supra*, 19 Cal.4th at p. 189 (dis. opn. of Kennard, J.).) Under that formulation, CALCRIM No. 625's reference to intent to kill alone could be misleading. For example, a jury might believe a defendant intended to kill but that intoxication caused the unreasonable belief that he or she needed to do so in self-defense. That jury

20

should convict the defendant of voluntary manslaughter, and not second degree murder on an express malice theory, because imperfect self-defense negates the malice. But CALCRIM No. 625 might lead that jury to believe it could not consider defendant's voluntary intoxication in connection with the claim of imperfect self-defense, and to potentially convict the defendant of second degree murder on a theory of express malice. However, for the reasons discussed below, any error is harmless.

With respect to the implied malice theory of second degree murder, at issue is the scope of section 29.4's ban on the use of voluntary intoxication evidence to negate implied malice. Does that provision merely preclude a defendant from arguing he or she was too intoxicated to actually appreciate the risks associated with his or her actions? Or does it also prevent a defendant from presenting voluntary intoxication evidence to show heat of passion or imperfect self-defense, which negate implied malice? We have found no published case addressing this issue.

We shall assume for purposes of this appeal that the former is correct, such that it was error not to instruct that voluntary intoxication evidence could be considered in assessing Esquivel's subjective state of mind for heat of passion and imperfect self-defense. Esquivel's challenge nevertheless fails because he has not established any prejudice resulting from that assumed error. (Cal. Const., art. I, § 13 [prohibiting reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*) [to prevail on a claim of ineffective assistance of counsel defendant must show trial counsel's performance was deficient and that deficiency prejudiced defendant].) "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*." (*Breverman*, *supra*, 19 Cal.4th at p. 178.) *Watson* harmless error "review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."

21

(*Id*. at p. 177.) In applying *Watson*, we may consider, among other things, the relative strength of the evidence supporting the existing judgment and the evidence supporting a different outcome, "the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831 (*Larsen*).)

With respect to heat of passion, it is undisputed that voluntary intoxication has no bearing on the objective element--whether " 'an average, *sober* person would be so inflamed that he or she would lose reason and judgment.' " (*Manriquez*, *supra*, 37 Cal.4th at p. 586, italics added; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83 (*Oropeza*).) The only evidence that Curiel engaged in what might objectively be considered sufficiently provocative conduct was Esquivel's testimony that Curiel was beating him up. Esquivel's version of events is "not only uncorroborated, it is at odds with a great deal of other evidence," namely the testimony of eyewitnesses, who saw Curiel throw a single punch, at most. (*Beltran*, *supra*, 56 Cal.4th at p. 956.) The weakness of the evidence of legally adequate provocation suggests any error was harmless. (*Ibid*.) That conclusion finds further support in the closing arguments. In closing, the prosecutor argued that defendant was not drunk at the time of the stabbing. Significantly, he did not suggest that if the jury disagreed it could not consider evidence of defendant's intoxication in deciding whether he killed in the heat of passion. And defense counsel argued defendant's intoxication was relevant to his state of mind. In view of the foregoing, we conclude there is no reasonable probability the court's failure to instruct on voluntary intoxication with respect to heat of passion affected the result at trial. For the same reasons, defendant fails to show there is a reasonable probability that, but for counsel's failure to request such an instruction, the result of the proceeding would have been different, as required to establish ineffective assistance of counsel. (*Ledesma*, *supra*, 43 Cal.3d at pp. 216-217.)

As to imperfect self-defense, the closing arguments again support a finding of harmless error, as the prosecutor did not claim the jury could not consider evidence of

22

defendant's intoxication in deciding whether he killed in imperfect self-defense, while defense counsel argued defendant's intoxication was relevant to his state of mind. In addition, the evidence that Esquivel was intoxicated at the time of the stabbing was equivocal. While defendant testified he was drunk, he also offered a precise and detailed account of the incident, which might reasonably shed doubt on his claimed intoxication. And Esquivel told Dr. Minagawa he was not drunk on the night of the stabbing. Finally, the defense theory as to imperfect self-defense was that various factors caused Esquivel to perceive a need to use deadly force, including childhood trauma, gang membership, and intoxication. The jury rejected the argument that Esquivel's traumatic experiences caused him (an armed gang member) to believe Curiel (who witnesses saw throw no more than one punch) posed an imminent danger of death or great bodily injury. In view of that finding, it is not reasonably probable the jury would have concluded Esquivel's intoxication caused him to fear for his life in those circumstances. For the foregoing reasons, any error in CALCRIM No. 625 was harmless.

### F. *CALCRIM Nos. 3471 and 3472*

Esquivel next contends the trial court erroneously instructed the jury with CALCRIM No. 3471 and CALCRIM No. 3472, both of which address limitations on the right of self-defense. No objection to either instruction was made at trial. On appeal, however, Esquivel insists the instructions were legally erroneous and unsupported by substantial evidence. In anticipation of the People's response that he forfeited the issue, Esquivel asserts his trial counsel rendered ineffective assistance by failing to object. He reiterates this ineffective assistance of counsel claim in his habeas petition. In view of that claim, we consider the merits of his challenge.

#### 1. *Standard of Review*

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) The error is "one of state law subject to the traditional *Watson* test," under which

23

"reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Id*. at p. 1130.) "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

### 2. CALCRIM No. 3471

The court instructed the jury with CALCRIM No. 3471 as follows: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if: [¶] 1. He actually and in good faith tries to stop fighting; [¶] AND [¶] 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] AND [¶] 3. He gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose. [¶] If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."

Esquivel says there was no evidence he either engaged in "mutual combat" or was "the initial aggressor," such that CALCRIM No. 3471 should not have been given. In fact, there was sufficient evidence from which the jury could have concluded that Esquivel threw the first punch, and thus was the initial aggressor in the fight with Curiel. Specifically, Fuentes testified Esquivel attacked Curiel, who never threw a punch. While other witnesses testified or told police Curiel did throw a punch, only one of those witnesses--Pereira--suggested that Curiel punched first. Because CALCRIM No. 3471 is written in the disjunctive, it applies when there is evidence the defendant either engaged in mutual combat or was the initial aggressor. And because there was sufficient evidence

24

Esquivel was the initial aggressor, we need not consider whether there was evidence of mutual combat as well.

Alternatively, Esquivel maintains CALCRIM No. 3471 misstated the law by using the phrase "initial aggressor" as opposed to "person who starts the fight." Esquivel contends that error was compounded by the prosecutor's argument during closings that Esquivel was the initial aggressor because he groped Fuentes, not because he initiated the physical encounter with Curiel. We see no difference in the "initial aggressor" and "person who starts the fight" formulations. Indeed, the instruction itself equates the two phrases, referring to both "the initial aggressor" and whether "the defendant started the fight." With respect to the prosecutor's argument, the jury reasonably could have concluded Esquivel physically assaulted Fuentes and that Curiel came to her defense. The authorities do not appear to require that the initial physical aggression be directed at the victim. (See *In re Christian S*. (1994) 7 Cal.4th 768, 773, fn. 1 [self-defense doctrine unavailable to "a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"]; CALCRIM No. 3471 (2007-2008 ed.) ["first one to use physical force"]; CALCRIM No. 3471 (2008 ed.) ["the initial aggressor"]; CALCRIM No. 3471 (2012 ed.) ["who starts a fight"].)

For these reasons, we conclude court did not err by instructing the jury as it did with CALCRIM No. 3471.

### 3. *CALCRIM No. 3472*

The court also instructed the jury with CALCRIM No. 3472, which provides: "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." At trial, the prosecutor argued Esquivel provoked the fight by groping Fuentes. Esquivel challenges that instruction as erroneous and unsupported by the evidence.

25

According to Esquivel, CALCRIM No. 3472 applies only where the defendant provokes a fight in order to create an excuse to use *deadly* force. Therefore, he says, the instruction misstated the law by omitting the word "deadly." In support of his contention, defendant relies on *People v. Hinshaw* (1924) 194 Cal. 1. There, the court stated: "There is no foundation for the assertion that by instruction the jury was practically charged that appellant 'started this fight with the premeditation beforehand to make a felonious assault.' The instruction is given in the abstract and correctly states the recognized principle of law 'that self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.' " (*Id.* at p. 26.) Although *Hinshaw* used the language "deadly issue," we see no reason to interpret this to mean that the defendant must have set out with the intent to kill the victim; indeed the concluding phrase suggests the contrary, that the defendant need only intend to secure an occasion to launch a physical attack. The phrase "force a deadly issue" may be understood to express a recognition that nearly any physical confrontation has lethal potential, if only by mischance.

Our conclusion is buttressed by the fact that the rule has been stated and applied in assault cases without any reference to deadly force since at least 1958, when a court wrote, "The plea of self-defense is not available to one who has sought a quarrel with the design or apparent necessity for making an assault." (*People v. Duchon* (1958) 165 Cal.App.2d 690, 693.) In *People v. Garcia* (1969) 275 Cal.App.2d 517, 523, the court stated the principle as follows: "A man has not the right to provoke a quarrel, go to it armed, take advantage of it and then convert his adversary's lawful efforts to protect himself into grounds for further aggression against him under the guise of self-defense." As our Supreme Court more recently stated: "It is well established that the ordinary self-defense doctrine--applicable when a defendant *reasonably* believes that his safety is endangered--may not be invoked by a defendant who, through his own wrongful conduct

26

(e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) As such, "a victim may respond to an attacker's initial[, nondeadly] physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947 (*Ramirez*).) In sum, CALCRIM No. 3472 correctly informed the jury that Esquivel did not have the right to invoke the defense of self-defense if he provoked a fight with Curiel with the intent to create an excuse to use any force, be it deadly or nondeadly force. There was sufficient evidence from which the jury could have concluded that Esquivel provoked the encounter by groping Fuentes.

Esquivel argues, in the alternative, that CALCRIM No. 3472 misrepresents the law by not stating that one who provokes a quarrel to create the need for nondeadly self-defense regains the right to use self-defense if the victim responds with deadly or excessive force. Recently, in *Ramirez*, a divided panel of Division Three of the Fourth Appellate District agreed, holding CALCRIM No. 3472 misstates the law by effectively advising "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) The majority in *Ramirez* rejected the contention that, read together, CALCRIM No. 3472 and CALCRIM No. 3471--which provides that a defendant who starts a fight with nondeadly force has a right to self-defense if the opponent responds with deadly force--correctly state the law. (*Ramirez*, *supra*, at pp. 949-950.) The majority was unpersuaded by that argument in large part because the prosecutor had argued the opposite to the jury--that "under CALCRIM No. 3472's command, 'it doesn't matter' whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions." (*Id.* at p. 950.)

27

Here, the prosecutor urged jurors during closing to "[p]ut the jury instructions to the side" if they concluded Esquivel "provoked" the encounter by grabbing Fuentes because, in that case, "he doesn't get perfect self-defense. He doesn't get imperfect self-defense and he doesn't get heat of passion. Stop right there. . . . [The instructions] don't apply." At oral argument, Esquivel's counsel analogized those comments to those of the prosecutor in *Ramirez* and urged us to adopt the majority's reasoning in that case.

We need not decide whether CALCRIM No. 3472 accurately states the law, as any error in the instruction was harmless under the applicable *Watson* standard. The evidence that Curiel responded with excessive or deadly force, which might support a different outcome if CALCRIM No. 3472 had been modified as Esquivel contends it should have been, was very weak. It consisted solely of Esquivel's testimony. The evidence that Curiel did not use excessive or deadly force was much stronger, consisting of the testimony of all the eyewitnesses, who saw at most one punch from Curiel. (*Larsen*, *supra*, 205 Cal.App.4th at p. 831 [the relative strength of the evidence supporting the existing judgment and the evidence supporting a different outcome are relevant under *Watson*].) Accordingly, it is not reasonably probable the jury would have concluded Esquivel acted in self-defense had CALCRIM No. 3472 been modified.

### G. *Prosecutorial Misconduct--Heat of Passion*

As the People concede, the prosecutor misstated the law on heat-of-passion voluntary manslaughter in his closing argument. He stated: "Heat of passion. It's got to be sufficient provocation by the victim. Again, one punch. A reasonable person would do the same in same circumstances. [¶] So what they're saying is that a reasonable person--put the defendant aside--a reasonable person in his shoes, not a reasonable drunk, not a reasonable gang member, not a reasonable person with character for violence--a reasonable person would have done the same thing, would have taken that knife out and stabbed another human being six times." The prosecutor further argued: "One punch doesn't cause an average person of reasonable disposition or a person of average

28

disposition to take out a knife, stab somebody over and over again."

The prosecutor distorted the law by arguing that the objective prong of heat of passion is satisfied only if a reasonable person would have reacted exactly as did the defendant. In fact, "[h]ow the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) Put differently, "provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949.)

Because Esquivel's attorney did not object, the claim of error has been waived. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.) Nonetheless, we proceed to consider the merits of the claim in response to Esquivel's assertion of ineffective assistance of counsel, which he advances on appeal and in his habeas corpus petition.

That claim fails because Esquivel has not established prejudice. To the contrary, the record indicates the prosecutor's statements were harmless for two reasons. First, the trial court correctly instructed the jury to follow its instructions, not the attorneys' description of the law, to the extent there was a conflict between the two. And the court correctly instructed the jury that the standard is whether the provocation would have caused the average person "to act rashly and without due deliberation." We presume the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Second, the evidence of provocation sufficient to justify voluntary manslaughter was weak, consisting only of Esquivel's own account of the fight. Thus, it is not reasonably probable the jury would have convicted Esquivel of heat-of-passion voluntary manslaughter instead of second degree murder had the prosecutor not misstated the law in his closing.

29

## H. Prosecutorial Misconduct--Provocation

Esquivel maintains the prosecutor also committed misconduct in his closing argument when he told the jurors, "[i]f you find that the defendant provoked the quarrel, if he provoked the situation, then you stop right there . . . he doesn't get heat of passion." Because the prosecutor's argument correctly stated the law, we find no misconduct.

"A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel *or in the heat of passion*. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*Oropeza*, *supra*, 151 Cal.App.4th at p. 83, italics added.)

## I. Cumulative Error

Esquivel contends the cumulative effect of the trial court's claimed errors was to deprive him of his right to due process right under the federal Constitution. Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to the defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."].) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Taking all of Esquivel's claims into account, we are satisfied that he received a fair adjudication. Defendant was "entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) While instructional error may have occurred and the prosecutor misrepresented the law on heat of passion, we are convinced his trial was fair.

*J*.     **Fines and Fees**

     *1.     Restitution and Parole Revocation Fines*

The abstracts of judgment impose separate restitution and parole revocation fines for each offense.  Esquivel asserts, and the People concede, that one of each of those fines must be stricken.  We agree.

Section 1202.4, subdivision (b) requires the imposition of a restitution fine "[i]n every *case* where a person is convicted of a crime."  (Italics added.)  Similarly, section 1202.45, subdivision (a) requires the imposition of "an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4," "[i]n every *case* where a person is convicted of a crime."  (*Ibid*., italics added.)  Thus, one restitution fine and one parole revocation restitution fine must be stricken.  (*People v. Ferris* (2000) 82 Cal.App.4th 1272, 1274 [modifying judgment to impose only one restitution fine under each of § 1202.4, subd. (b) and § 1202.45].)

Esquivel further argues that the trial court intended to impose the minimum restitution fine under section 1202.4, subdivision (b), which was $200 at the time he committed the charged crimes; therefore, the imposition of the $240 restitution fine violates the prohibition against ex post facto laws.  With respect to the section 1202.4, subdivision (b) restitution fine, the court stated:  "I would rather have the money go to restitution so I'd like to reduce that to the minimum so we get money paid to the victims.  So . . . what is it, 200-plus . . . is that 240 or 250?"  It does appear the trial court intended to impose the minimum restitution fine under section 1202.4, subdivision (b) to maximize Esquivel's ability to pay direct victim restitution under subdivisions (a) and (f) of the statute.  (*People v. Villalobos* (2012) 54 Cal.4th 177, 181 [§ 1202.4, subd. (b) "restitution fine is not paid by the defendant directly to the victim"].)  However, our analysis does not end there because Esquivel failed to object at trial.  The People say that, as such, he forfeited the issue.  We agree.

31

As a general rule, claims of sentencing error are waived unless the defendant makes a contemporaneous objection. (*People v. Scott* (1994) 9 Cal.4th 331, 351-353.) The forfeiture rule applies to ex post facto claims. (*People v. White* (1997) 55 Cal.App.4th 914, 917.) An exception to the forfeiture doctrine exists for "unauthorized sentences"--those that "could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott*, *supra*, at p. 354.) But the $240 restitution fine cannot be characterized as unauthorized because section 1202.4, subdivision (b) authorized a restitution fine of up to $10,000 at the time Esquivel committed his crimes. Thus, that exception does not save him here; he forfeited the issue.

### 2. *Criminal Conviction Assessments and Court Security Fees*

The People concede error in connection with the criminal conviction assessments and court security fees the court imposed. The court orally set forth a $50 criminal conviction assessment and a $50 court security fee for each conviction. But section 1465.8, subdivision (a)(1) authorizes the imposition of a criminal conviction assessment of just $40 "on every conviction for a criminal offense." And Government Code section 70373, subdivision (a)(1) authorizes the imposition of only a $30 assessment on every conviction to fund court facilities. (The abstracts of judgment incorrectly reflect $60 criminal conviction assessments and court security fees, instead of the $50 fees the trial court imposed orally.) We shall modify the judgment to order Esquivel to pay criminal conviction assessments of $40 on each conviction and court security fees of $30 on each conviction.

## III.   WRIT PETITION

In his petition for a writ of habeas corpus, Esquivel contends his trial counsel's representation fell below the standards for effective assistance because counsel (1) did not object to CALCRIM No. 625 on the ground it improperly limited the jury's consideration of voluntary intoxication evidence; (2) did not object to CALCRIM No. 3471 as legally incorrect and factually inapplicable; (3) did not object to CALCRIM No.

3472 as legally incorrect and factually inapplicable; and (4) did not object to the prosecutor's mischaracterization of the law concerning heat of passion. We have considered each of these issues on the merits above and concluded that Esquivel was not prejudiced by any instructional error, nor by the prosecutor's statements. Accordingly, his ineffective assistance of counsel claims fail. (*People v. Cowan* (2010) 50 Cal.4th 401, 493, fn. 31 [alternative claim of ineffective assistance of counsel fails where "there is no reasonable probability of a different result had counsel requested and received the instruction"].)

## IV.  DISPOSITION

The judgment is modified to provide imposition of (1) a single Penal Code section 1202.4, subdivision (b) restitution fine of $240; (2) a single Penal Code section 1202.45 parole revocation restitution fine of $240, which is suspended unless parole is revoked; (3) a criminal conviction assessment of $40 on each conviction; and (4) a court security fee of $30 on each conviction. The judgment is affirmed as modified. The superior court is directed to prepare an amended abstract of judgment to reflect this modification and shall notify the Department of Corrections of the modification.

The petition for writ of habeas corpus is denied.

_____
Premo, J.

WE CONCUR:



_____
Rushing, P.J.




_____
Elia, J.